UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KEVIN MURPHY and PAMELA MURPHY,

        Plaintiffs,

-v-

GUILFORD MILLS, INC.,

        Defendant.

No. 02 Civ. 10105 (LTS)(THK)

**ORIGINAL**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 04/22/05

OPINION AND ORDER

APPEARANCES:

LAWRENCE M. KARAM, P.C.
By: Lawrence M. Karam, Esq.
41 West 72nd Street, Suite 1-F
New York, New York 10023

STEPHEN D. CHAKWIN, JR., ESQ.
By: Stephen D. Chakwin, Jr., Esq.
28 West 35th Street, Second Floor
New York, New York 10028

*Attorneys for Plaintiffs*

EPSTEIN BECKER & GREEN
By: Evan J. Spelfogel
    Robyn Ruderman
250 Park Avenue
New York, New York 10177-0077

*Attorneys for Defendant*

LAURA TAYLOR SWAIN, United States District Judge

Copies mailed 4-22-05
Chambers of Judge Swain

Plaintiff Kevin Murphy ("Murphy") and his wife Pamela Murphy (together, "Plaintiffs") bring this action seeking damages for negligence arising out of Defendant Guilford Mills, Inc.'s ("Guilford") prostate cancer screening program for employees. Plaintiffs bring causes of action for negligence based on misinformation provided to Murphy by Medical Screening Services ("MSS"), a company Guilford retained to conduct the prostate cancer screenings, and independent acts of negligence by Guilford related to the screenings that allegedly caused Murphy to delay seeking treatment for prostate cancer.

Defendant moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, pursuant to Rule 56 for summary judgment dismissing Plaintiffs' claims in their entirety. Plaintiffs have cross-moved for summary judgment on the issue of Guilford's vicarious liability for MSS's negligence. The Court has subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 1332. The Court has considered thoroughly all submissions in connection with the instant motion. For the following reasons, Defendant's motion for summary judgment is granted, and Plaintiffs' cross-motion is denied.

## BACKGROUND

The following facts are undisputed unless characterized as claims or allegations.

### A. The Prostate Cancer Screening Program

Defendant Guilford Mills is a textile manufacturer based in North Carolina with offices and plants throughout the United States. (Defendant's Local Rule 56.1 Statement ("DR 56.1") ¶ 1.) Guilford annually offered free prostate cancer screenings to its male employees. (DR 56.1 ¶ 6.) Guilford had retained MSS, a company owned and operated by Raymond Fritsch

("Fritsch"), to conduct the prostate cancer screenings since 1993. (DR 56.1 ¶ 7; Dep. of Raymond Fritsch at 14-15.) Fritsch conducted thousands of these screenings for Guilford during the course of the program, which, as required by law, were ordered by Dr. Ron Joyner, the managing medical director at Guilford (DR 56.1 ¶ 8; Plaintiffs' Local Rule 56.1 Statement ("PR 56.1") ¶ 54; Fritsch Dep. at 47). Fritsch would invoice Guilford for MSS's services, and receive payments on a per-test basis. (Fritsch Dep. at 15, 102, 146.)

Each year, Fritsch coordinated with Guilford's New York City office manager, Barry Bletcher, to schedule the screenings for that office, which were performed in a conference room there. (DR 56.1 ¶¶ 9-10.) Fritsch would set up his equipment and then spend about two hours drawing blood from the employees who came to the screening. (PR 56.1 ¶ 45; Fritsch Dep. at 23-24.) Fritsch generally performed the blood work himself, but he was occasionally assisted by individuals from a local laboratory of SmithKline Beecham ("SKB") who drew blood for him. (Fritsch Dep. at 21-22.) After collecting the blood samples, Fritsch would deliver the samples to SKB's lab, which tested the Prostate Serum Antigen ("PSA") level in the blood. (DR 56.1 ¶ 14.) PSA is a protein produced by the prostate gland, high levels of which may indicate the presence of cancer. (Aff. of Evan J. Spelfogel, Ex. J.)

SKB then reported the test results for each screened employee to Fritsch in a one-page laboratory report, which included the name of the employee and his PSA level (the "SKB Report"). (DR 56.1 ¶ 15; Spelfogel Aff., Ex. I.) If the PSA Level was 4 or less, it was reported in a green column under a heading that read, "IN RANGE"; if the PSA level was greater than 4, the number was reported in a red column reading "OUT OF RANGE." (Id.) Fritsch then interpreted the results and filled out a cover page ("MSS Cover Page") to attach to the SKB

Report. (DR 56.1 ¶ 16.) The MSS Cover Page included the PSA level of the employee and two boxes that Fritsch checked off depending on the employee's PSA level. If the PSA level was above 4, Fritsch normally checked a box stating "[t]his is considered high, see your doctor." (DR 56.1 ¶ 18.) If the PSA level was below 4, Fritsch normally checked a box that read, "This is considered OK." (DR 56.1 ¶ 19.) The MSS Cover Page also included language stating, "It is YOUR responsibility to consult your doctor with any questions . . . . While a level below 4.0 is considered 'normal' it does not rule out the presence of cancer . . . . Consult your physician if your level is above 2.0 ng/ml." (Spelfogel Aff., Ex. J.)

Fritsch stapled the MSS Cover Page to the corresponding SKB Report for each employee and then sealed the two pages in envelopes addressed separately to each employee and marked "personal and confidential." (DR 56.1 ¶ 22.) Fritsch then placed all of the individual envelopes into one large envelope and sent the results to Bletcher. (DR 56.1 ¶ 23; Fritsch Dep. at 130-31.)[1] After receiving the large envelope with the test results, Bletcher would distribute the individual envelopes to the employees. (DR 56.1 ¶ 23.) Bletcher never opened the sealed envelopes and was not otherwise informed of the test results of the employees when he distributed the envelopes. (Id. ¶ 24.)

Fritsch also forwarded copies of the SKB Report (but not the MSS Cover Pages) for each employee in the New York City office to the company nurse at Guilford's headquarters in North Carolina. (DR 56.1 ¶¶ 26-27.) Fritsch's practice was to inform the nurse only about employees with elevated PSA levels, so that the nurse could send a follow-up note to those

---

[1] Plaintiffs assert that the MSS Cover Page and other release forms and paperwork used in connection with the screenings were the products of a joint effort between Fritsch and Guilford. (PR 56.1 ¶¶ 49, 51.)

particular employees, advising them to contact their primary care physicians. (DR 56.1 ¶¶ 32-36.) Defendant claims that, unless Fritsch called the nurse's attention to particular results with elevated PSA levels, the reports were not reviewed but simply stored away as records, since the results had already been sent to the employees. (Id. ¶¶ 31, 37-39.)

### B. Murphy's Participation in the Prostate Cancer Screening

Murphy participated in one of the free screenings at Guilford's New York City office in 1999. (DR 56.1 ¶ 40.) At the time, Murphy was the International Vice President of Sales and Marketing of several of Guilford's subsidiaries. He claims, however, that he was never a Guilford Mills, Inc. employee. (PR 56.1 ¶ 1; Decl. of Kevin Murphy (Aff. of Lawrence Karam, Ex. 11) ¶¶ 3-4, 10.) Murphy nonetheless traveled and conducted business for Guilford, and he spent up to ten percent of his time in Guilford's New York City office. (DR 56.1 ¶ 5; K. Murphy Dep. at 13, 44, 49.)

Murphy was conducting business in the New York City office on the day that Fritsch was conducting the prostate cancer screenings, and Murphy decided to take the test. (PR 56.1 ¶ 87; K. Murphy Dep. at 76.) Murphy had never seen Fritsch in the office before, and he learned from Bletcher before his blood was drawn that Fritsch was not a Guilford employee. (K. Murphy Dep. at 86-87, 160.) Fritsch drew Murphy's blood along with the blood of the other participants, forwarded the samples to SKB, and then received the SKB Reports, including the report for Murphy. (DR 56.1 ¶¶ 42-43.)

SKB's report on Murphy's test listed his PSA level as 13.9, under the "out of range" column. (DR 56.1 ¶ 43.) In filling out the MSS Cover Page, Fritsch correctly listed Murphy's PSA level as 13.9. (DR 56.1 ¶ 44.) However, Fritsch checked off the box stating that

Murphy's level was "considered OK" instead of checking the box advising Murphy to see a doctor. Fritsch admits that he checked the wrong box, given that Murphy's PSA level was well above the normal range. (DR 56.1 ¶¶ 45-46.) Consistent with Fritsch's practice, Murphy's MSS Cover Page was sent to Murphy but not to Guilford. (DR 56.1 ¶ 50.) Fritsch sent the SKB Reports to the company nurse, Ellen Scott, but he never notified her that Murphy's PSA level was elevated, and she therefore did not follow-up with Murphy. (DR 56.1 ¶¶ 49, 62-64.)

Murphy received his test results, including the MSS Cover Page and the SKB Report, but he claims that he only read the portion of the form stating that he was "okay." (DR 56.1 ¶ 53; PR 56.1 ¶ 23.) Upon returning home, his wife, Plaintiff Pamela Murphy, asked him why the number 13.9 on the SKB Report was listed in the "out of range" column. (DR 56.1 ¶ 56.) In response, Murphy allegedly called office manager Bletcher to ask him about the test results. (PR 56.1 ¶ 21.) Bletcher told Murphy to look at the MSS Cover Page. (PR 56.1 ¶ 21; K. Murphy Dep. at 103.) Murphy told Bletcher only that "[i]t says I'm okay," and Bletcher replied, "Then you're okay." (Id.) Murphy never mentioned that his PSA level was 13.9. (K. Murphy Dep. at 171.) Plaintiffs claim that Bletcher nonetheless could or should have been aware of the results because his general practice was to go over the meaning of the particular value with the employee when questioned. (PR 56.1 ¶ 22.)

Murphy did not consult a doctor until sixteen months after receiving his test results. (DR 56.1 ¶ 66.) When he did, he was diagnosed with advanced prostate cancer. (DR 56.1 ¶ 67.) Plaintiffs filed this lawsuit against Guilford in the New York State Supreme Court, New York County, in November 2002. (DR 56.1 ¶ 71.) Defendants then removed the action to this Court on diversity and ERISA preemption grounds. (DR 56.1 ¶ 72.)

## DISCUSSION

Defendant moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, pursuant to Rule 56 for summary judgment, dismissing Plaintiffs' negligence claims. Because the Court has considered matters outside the pleadings, the Court treats Defendant's motion as one for summary judgment.

### A. Summary Judgment Standard

Summary judgment is to be granted in favor of a moving party where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that there is no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A fact is considered material to summary judgment "if it might affect the outcome of the suit under the governing law," and an issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (internal citation omitted). The Second Circuit has explained, however, that the "party against whom summary judgment is sought. . . 'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

Defendant claims, among other things, that Fritsch was an independent contractor, and thus Guilford is not liable for his error in filling out Murphy's form. Plaintiffs deny Fritsch's

status as an independent contractor in their Local Rule 56.1 Statement (PR 56.1 ¶ 3), but Plaintiffs' primary argument in their cross-motion is that, regardless of whether Fritsch was actually an independent contractor, Defendant is vicariously liable for Fritsch's conduct on a theory of apparent or ostensible agency. Plaintiffs further assert that Defendant can be held liable for Fritsch's conduct under several exceptions to the independent contractor rule and for independent acts of negligence arising from its negligent administration of the prostate cancer screening program and Bletcher's alleged negligence in advising Murphy that he was "okay".

## B. Vicarious Liability for Actions of Fritsch/MSS

### 1. Independent Contractor

Defendant claims that it is not vicariously liable for Fritsch's error because Fritsch was an independent contractor. Under New York law, upon which both parties rely for the purposes of this motion, "[t]he general rule is that a party who retains an independent contractor, as distinguished from a mere employee or servant, is not liable for the independent contractor's negligent acts." Rosenberg v. Equitable Life Assurance Society of the United States, 595 N.E.2d 840, 842 (N.Y. 1992); Zedda v. Albert, 650 N.Y.S.2d 301, 301-02 (2d Dep't 1996).

This rule is based on the principle that "one who employs an independent contractor has no right to control the manner in which the work is to be done, and thus, the risk of loss is more sensibly placed on the contractor." Zedda, 650 N.Y.S.2d at 302; see also Melbourne v. New York Life Ins. Co., 707 N.Y.S.2d 64, 66 (1st Dep't 2000). Consistent with this rationale, the standard for determining whether an employee is an independent contractor focuses on the degree of control that the employer exercises over the "methods and means by which the work is to be done." Harjes v. Parisio, 766 N.Y.S.2d 270, 271 (3d Dep't 2003).

Apart from the question of control, other relevant considerations "include the employment by the contractor of assistants with the right to supervise their activities; his obligation to furnish necessary tools, supplies, and materials; the method of payment of compensation; the independent nature of the contractor's business; and the power to terminate the contract." Szabados v. Quinn, 548 N.Y.S.2d 442, 443 (1st Dep't 1989). Although the question of independent contractor status is often a question of fact, where the evidence in the record is undisputed, courts may resolve the issue as a matter of law. Id.; see also Mason v. Spendiff, 656 N.Y.S.2d 462, 463 (3d Dep't 1997); Zedda, 650 N.Y.S.2d at 302.

The undisputed evidence of record here demonstrates that Fritsch was an independent contractor. Fritsch owned and operated MSS, a company in the business of conducting prostate cancer screenings. He entered into an agreement with Guilford to perform the PSA screenings in 1993. He supplied his own equipment to conduct the tests. He occasionally employed assistants to draw the blood on his behalf. He would invoice Guilford for MSS's services, and he received compensation on a per-test basis. Fritsch's role was to draw blood, have the blood tested by a lab, and then transmit the results to Guilford. (Fritsch Dep. at 35.) There is no evidence indicating that Guilford directed or controlled the "methods and means" by which he performed these tasks.

Although Plaintiffs do not respond directly to this point in their opposition motion, they deny Fritsch's status as an independent contractor in their Local Rule 56.1 Statement. (PR 56.1 ¶ 3.) Plaintiffs assert that Guilford retained overall control of the screening process, and more particularly, that Guilford played a role in the planning of the tests, the forms used in connection with the tests, and the manner in which the test results were disseminated.

The retention of general supervisory powers to ensure that an independent contractor meets the plans and specifications of an agreement will not alone render a defendant vicariously liable for the contractor's negligent conduct. Eastern Airlines v. Joseph Guida & Sons Trucking Co., 675 F. Supp. 1391, 1397 (E.D.N.Y. 1987); see also Lazo v. Mak's Trading Co., 605 N.Y.S.2d 272, 274 (1st Dep't 1993). "Practically every contract for work to be done reserves to the employer a certain degree of control, to the end that he may see that the contract is performed to specifications." Mace v. Morrison & Fleming, 44 N.Y.S.2d 672, 674 (3d Dep't 1943). There is therefore a key distinction between control over the results of an independent contractor's work, generally specified through the contract or agreement, and interference with the independent contractor's work through control over the "method and means" of his performance. See Beach v. Velzy, 143 N.E. 805, 806 (N.Y. 1924) ("That appellant gave some directions, not as to method or means of doing the work, but as to the work to be done, does not change the relation of the parties. He did little more than to furnish some verbal specifications for roofing, leaving to claimant control over the time, method, and means of doing the work."); see also Melbourne, 707 N.Y.S.2d at 67 ("Indeed, there is no evidence that [defendant], other than requesting the examinations be done, had anything at all to do with the manner in which they were performed.").

Guilford's general supervisory power over its prostate cancer screening program did not affect Fritsch's status as an independent contractor as a matter of law. Fritsch's core role in the screenings was to draw blood, test the blood, and then return the test results to Guilford. In order to perform his task, Fritsch had to coordinate with Guilford to schedule convenient testing times, but that fact is immaterial to the question of whether Guilford controlled the "method and

means" of Fritsch's work.

Furthermore, the evidence that certain forms used in conjunction with the testing, including the MSS Cover Page, were a joint effort of Guilford and Fritsch also does not alter Fritsch's status as an independent contractor. As to the MSS Cover Page, Guilford was free to specify in its agreement with MSS that Fritsch should submit the results to Guilford employees in a certain way. Although Guilford may have partially specified the contents of the MSS Cover Page, there is no evidence indicating that it directed or controlled the method or manner in which Fritsch completed the form. Similarly, the release forms that Guilford allegedly reviewed were incidental to Fritsch's screening responsibilities. That Guilford may have initially reviewed those forms prior to agreeing to allow Fritsch to screen Guilford's employees each year does not evidence the sort of control over the means and method of the actual screenings that would either convert Fritsch into a Guilford employee or create a triable question of fact on this issue. Finally, Guilford's control over the dissemination of the test results is irrelevant given that, once Fritsch submitted the results to Guilford in a sealed envelope for each employee, the testing and his work for Guilford were complete.

The Court finds that Fritsch was Guilford's independent contractor as a matter of law, as there are no genuine issues of material fact regarding whether Guilford exercised any relevant degree of control over the method and means of Fritsch's work.

2. Apparent Agency Doctrine

Plaintiffs' second claim for vicarious liability is that, regardless of whether Fritsch was in fact Defendant's independent contractor, Defendant is still liable for Fritsch's conduct on a theory of apparent or ostensible agency (also known as the doctrine of "agency by estoppel").

The doctrine of apparent agency holds that "[o]ne who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by its servants is liable for the negligence of the contractor." Mondello v. New York Blood Ctr., 604 N.E.2d 81, 86 (N.Y. 1992) (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 429); Hill v. St. Clare's Hosp., 490 N.E.2d 823, 828 n. 5 (N.Y. 1986).

There is no genuine issue of fact as to whether Murphy accepted Fritsch's services "in the reasonable belief that the services [were] being rendered by the employer or by its servants." See Mondello, 604 N.E.2d at 86. The undisputed evidence here indicates that, prior to having his blood drawn, Murphy learned from Bletcher that Fritsch was not a Guilford employee. (K. Murphy Dep. at 86-87.) In his deposition, Murphy stated quite clearly that he "was told by an employee of Guilford Mills that [Fritsch] was not [an employee, official, or agent of Guilford Mills]." (K. Murphy Dep. at 160.) On these undisputed facts, Guilford cannot be held vicariously liable to Plaintiffs for Fritsch's error on an apparent agency theory.

C. Negligent Supervision and Negligent Administration

Plaintiff next argues that, regardless of whether Guilford is vicariously liable for Fritsch's error, Guilford is independently liable for negligent supervision of Fritsch and the negligent administration of its prostate cancer screening program.

An employer may be held liable for negligent supervision despite the general rule that a defendant is not liable for the negligent acts of its independent contractors. Maristany v. Patient Support Servs, Inc., 693 N.Y.S.2d 143, 144-45 (1st Dep't 1999). Given an employer's right to rely on the "supposed qualifications and good character of the contractor," however, the

employer is not liable under this exception "unless it also appears that the employer either knew, or in the exercise of reasonable care might have ascertained, that the contractor was not properly qualified to undertake the work." Id. at 145.

Plaintiffs offer no evidence demonstrating that Guilford had any reason to doubt Fritsch's qualifications or his ability to properly perform the screenings and deliver accurate test results. On the contrary, the facts show that, over their seven-year relationship, Fritsch conducted thousands of these tests for Guilford without incident. In addition, Fritsch already had at least five years of experience performing prostate cancer screenings for multiple clients before Guilford retained his services. Plaintiffs argue that Fritsch's perfect track record is misleading because Guilford had no system in place to detect false reports. Plaintiffs suggest that without such a system of oversight in place, similar errors may have gone unnoticed in the past. Apart from such speculation, however, Plaintiffs offer no evidence that errors actually occurred. Plaintiffs have thus failed to produce any evidence demonstrating that Guilford either knew or should have known that Fritsch was unqualified to conduct the prostate cancer screenings. As a result, Guilford is entitled to summary judgment on Plaintiffs' negligent supervision claim. See Maristany, 693 N.Y.S.2d at 145 ("Because she had previously worked for [the defendant] and had given no indication that she was incompetent, there is no viability to the claim that [the defendant] was negligent in assigning her to the care of [the plaintiff]."); see also Diaz v. New York Downtown Hosp., 731 N.Y.S.2d 694, 695 (1st Dep't 2001), aff'd, 784 N.E.2d 68 (N.Y. 2002) ("Once the [defendant] established, and plaintiff failed to rebut, the lack of reasonable foreseeability based on the background check, it was entitled to judgment as a matter of law on a claim for negligent supervision.").

Plaintiffs also claim that Guilford was negligent in its administration of the prostate cancer screening program. Specifically, Plaintiffs allege that Guilford was negligent for failing to institute adequate safeguards to detect the presence of false negative reports. The question then is whether Guilford had a duty to implement such safeguards.

Duty is a threshold question for courts to determine as a matter of law. Hamilton v. Beretta U.S.A. Corp., 750 N.E.2d 1055, 1060 (N.Y. 2001). "The determination of duty is not "derived or discerned from an algebraic formula. Rather, it coalesces from vectored forces including logic, science, weighty competing socioeconomic policies and sometimes contractual assumptions of responsibility." Palka v. Servicemaster Mgmt. Servs. Corp., 634 N.E.2d 189, 192 (N.Y. 1994). Here, Plaintiffs essentially claim that Guilford had a duty to double check Fritsch's work. As stated above, however, Guilford had a right to rely on the "supposed qualifications and good character of the contractor." See Maristany, 693 N.Y.S.2d at 145. Plaintiffs present no statutes or case law in support of their claim that Guilford had a duty to add safeguards to its screening program. Therefore, the Court concludes as a matter of law that Plaintiff has raised no triable issue as to whether Guilford had a duty to institute additional safeguards in its prostate cancer screening program.

D. Ratification of Negligence

Plaintiffs also claim that Guilford ratified the negligence of its independent contractor through Bletcher's statement that Murphy was "okay." Liability premised upon ratification of an injury-producing act is another exception to the general rule that an employer is not liable for the negligence of its independent contractors. See Kormanyos v. Champlain Valley Fed. Sav. and Loan, 583 N.Y.S.2d 538, 539 (3d Dep't 1992).

Nonetheless, "[i]t is a well-established rule of law that if the person in whose name an act was performed subsequently ratifies or adopts what has been so done, the ratification relates back and supplies original authority to do the act." N.Y. Jur. Agency § 170. Agency law requires that, in order to ratify an agent's act, the principal must have "full knowledge of the material facts relating to the transaction, and the assent must be clearly established and may not be inferred from doubtful or equivocal acts or language." Rocky Point Props., Inc. v. Sear-Brown Group, Inc., 744 N.Y.S.2d 269, 271-72 (4th Dep't 2002). "Ratification requires intent based on knowledge." Bunge Corp. v. Mfrs. Hanover Trust Co., 318 N.Y.S.2d 819, 835-36 (N.Y. Sup. Ct. 1971); see also Soma v. Handruils, 277 N.Y. 223, 227 (N.Y. 1938). Thus, ratification requires not only knowledge of the material facts, but also an intention to ratify another's actions. These principles are consistent with the ratification doctrine as developed in the tort context in cases involving independent contractors. See Herman v. City of Buffalo, 108 N.E. 451, 454 (N.Y. 1915) (Bartlett, C.J., concurring); Vogel v. Aldermen, 92 N.Y. 10, 19 (N.Y. 1883).

The key question here, therefore, is whether Guilford knew that the MSS Cover Page contained an error in that it stated that Murphy was "okay" despite the fact that his PSA level was 13.9. The record reveals that Guilford never received copies of the MSS Cover Page. In addition, the evidence also reveals that Bletcher delivered the test results from the prostate cancer screening in sealed envelopes and thus had no way of knowing the precise contents of the MSS Cover Page unless that information was volunteered by the employees. Further, Murphy testified in his deposition that he never told Bletcher that his PSA level was 13.9. (K. Murphy Dep. at 171.) Bletcher confirmed that he never learned Murphy's PSA level. (Bletcher Dep. at

80.) Given that there is no evidence that either Bletcher or Guilford had knowledge of the material facts that would have informed them that the MSS Cover Page contained an error, Guilford cannot be said to have ratified or adopted Fritsch's mistake. Bletcher's statement that Murphy was "okay" when, made without knowledge of Murphy's PSA level, did not constitute ratification by Guilford of Fritsch's statement that Murphy's PSA level was "okay."

Plaintiffs nonetheless contend that Bletcher's statement that Murphy was "okay" was negligent. As discussed above, Bletcher had no knowledge of Murphy's PSA level. Thus, when he asked Murphy to look at the top of the MSS Cover Page and Murphy simply relayed to him the information that it said he was "okay", it was perfectly reasonable for Bletcher to rely on the "supposed qualifications and good character of the contractor." See Maristany, 693 N.Y.S.2d at 145. Although Bletcher certainly had a duty to speak carefully, New York law permits an employer to rely on one's independent contractor, and the Court refuses to find that Bletcher's reliance in this case supports a viable claim of negligence. A contrary rule would render employers liable for reasonable reliance on their independent contractors and would thus be inconsistent with New York law.

Finally, Plaintiffs suggest that Bletcher had a duty to inquire further about Murphy's test results and that Guilford should have known Murphy's PSA value. (PR 56.1 ¶ 21.) That Bletcher may have interpreted results for employees in the past does not automatically create such a duty in relation to Murphy. Taddeo v. Tilton, 289 N.Y.S. 427, 430 (4th Dep't 1936) ("Failure to comply with a practice which a party was under no obligation to follow or enforce, and which was unknown to and was not relied upon by another, does not constitute evidence of actionable negligence."). The Court finds that Bletcher did not have any such duty,

and that Guilford was not negligent for relying on the representations of Fritsch, Guilford's independent contractor.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted, and Plaintiffs' cross-motion is denied. The Clerk of Court is respectfully requested to enter judgment in Defendant's favor and close this case.

Dated: April 22, 2005
New York, New York

LAURA TAYLOR SWAIN
United States District Judge